# IN THE COURT OF APPEALS OF IOWA

No. 20-1055
Filed September 1, 2021


**PHILLIP D. GREER,**
        Plaintiff-Appellant,

**and**

**RICHARD L. GREER and GREER CLEANING, LLC d/b/a SPARKLING CLEAN,**
        Plaintiffs,

**vs.**

**TAILOR MAID SERVICES, LLC, DONNETTE SMITH, STEWART SMITH and TOM DIEDRICH,**
        Defendants-Appellees.
_____


        Appeal from the Iowa District Court for Linn County, Mary E. Chicchelly,

Judge.


        Phillip Greer appeals the district court's order dismissing his breach-of-

contract action against the defendants for lack of personal jurisdiction. **AFFIRMED**

**IN PART, REVERSED IN PART, AND REMANDED.**


        Phillip D. Greer, Cedar Rapids, self-represented appellant.

        Donnette Smith, Blue Ridge, Texas, self-represented appellee.

        Stewart Smith, Blue Ridge, Texas, self-represented appellee.

        Tom Diedrich, Dallas, Texas, self-represented appellee.


        Considered by Vaitheswaran, P.J., and Tabor and Ahlers, JJ.

**VAITHESWARAN, Presiding Judge.**

Cedar Rapids resident Phillip Greer sued Texas company Tailor Maid Services, LLC (Tailor Maid) and Texas residents Donnette Smith, Stewart Smith, and Tom Diedrich[1] following failed negotiations to purchase the Texas company. He and two other plaintiffs, Richard Greer and Greer Cleaning, LLC, alleged in part that a letter of intent afforded the plaintiffs "the exclusive right to negotiate terms with the seller" and the defendants breached the letter of intent "by entering into discussions with one or more other interested buyers during the exclusive negotiating time frame." The district court granted a defense motion to dismiss the petition for lack of personal jurisdiction or standing.[2]

On appeal, Phillip Greer argues (1) "the District Court erred in determining that the 'Letter of Intent' was not a valid contract"; (2) "the District Court erred in [d]etermining that the Plaintiffs had not incurred any damages and thus had no standing to file suit"; and (3) "the District Court erred in not applying the 'Calder Test' in determining whether the Defendants are subject to specific jurisdiction in the state of Iowa." The third issue is dispositive, stated more generically as whether the court had personal jurisdiction over the Texas defendants.

---

[1] Deidrich was never served with process.

[2] Phillip Greer represented himself and also purported to act on behalf of Richard L. Greer and Greer Cleaning. In an order denying his request for additional time to serve the defendants, the district court noted that Phillip Greer did not appear to be a licensed attorney and Iowa law did not allow business entities other than partnerships to represent themselves in court except through a licensed Iowa attorney, nor did Iowa law allow a non-lawyer to represent others in court. Phillip Greer moved to dismiss the other two plaintiffs. The district court found it unnecessary to rule on the motion.

The United States Supreme Court recently reaffirmed the "minimum contacts" standard for establishing personal jurisdiction. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). The Court stated the focus is "on the nature and extent of the defendant's relationship to the forum State." *Id.* (internal quotation and citation omitted). The Court proceeded to discuss general and specific jurisdiction. *Id.* at 1024–25. Specific jurisdiction—the only type at issue here—"covers defendants less intimately connected with a State, but only as to a narrower class of claims" than encompassed by general jurisdiction. *Id.* at 1024. "The contacts needed for this kind of jurisdiction often go by the name 'purposeful availment.'" *Id.* "The defendant . . . must take some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* (alteration in original) (internal quotation and citation omitted). The contacts "must show that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there." *Id.* at 1025 (alteration in original) (internal quotation and citation omitted). But "even then—because the defendant is not 'at home'—the forum State may exercise jurisdiction in only certain cases." *Id.* "The plaintiff's claims . . . must arise out of or relate to the defendant's contacts with the forum." *Id.* (internal quotation and citation omitted).

The purposeful-availment requirement was explicated by the Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). There, the Court stated, "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Burger King Corp.*, 471 U.S. at 475 (citations omitted). Where

defendants create "'continuing obligations' between [themselves] and residents of the forum," purposeful availment will be found. *Id.* at 476. "Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State." *Id.* "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.*

Jurisdiction over defendants also may be appropriate based on the effects of their out of state conduct. *See Calder v. Jones*, 465 U.S. 783, 789 (1984). In *Calder*, Florida defendants were "primary participants in an alleged wrongdoing intentionally directed at a California resident." *Id.* at 790. The Court concluded jurisdiction over them was proper. *Id.*

Iowa follows the same framework. *See Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 892–93 (Iowa 2014) (noting, "In the past we have used a five-factor test to evaluate whether a nonresident defendant had sufficient minimum contacts with Iowa," but "[a]lthough we have never expressly disavowed the five-factor test, we have recently followed the modern framework, which evaluates two criteria": "whether the defendant has purposefully directed his activities at residents of the forum and whether the litigation results from alleged injuries that arise out of or relate to those activities" (internal quotations and citations omitted)); *Shams v. Hassan*, 829 N.W.2d 848, 856 (Iowa 2013) (noting,

"we have utilized an arguably different test from the federal model," but "we have followed the modern federal framework more closely in recent years"). Our courts examine whether a "defendant has purposefully directed [the defendant's] activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Cap. Promotions*, *L.L.C. v. Don King Prods., Inc.*, 756 N.W.2d 828, 834 (Iowa 2008) (quoting *Burger King Corp.*, 471 U.S. at 472–73). The supreme court has cited and applied the *Calder* effects test. *Id.* at 836–37. In *Capital Promotions*, the court stated, "The *Calder* 'effects' test, as it has come to be known, is but one facet of the ordinary minimum contacts analysis, to be considered as part of the full range of the defendant's contacts within the forum." *Id.* at 836 (internal quotation and citation omitted).

The court also addressed the thorny issue of when internet marketing triggers personal jurisdiction. *Sioux Pharm, Inc. v. Summit Nutritionals Int'l, Inc.*, 859 N.W.2d 182, 193 (Iowa 2015). Although *Sioux Pharm, Inc.* considered general rather than specific jurisdiction, the court cited and applied a test used in the specific jurisdiction context:

> [T]he likelihood that personal jurisdiction can be constitutionally exercised is *directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet.* This sliding scale is consistent with well developed personal jurisdiction principles. At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. *A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction.* The middle ground is occupied by interactive Web sites where a user can exchange

information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Id.* (alterations in original) (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

With these principles in mind, we turn to the standard of review and burden of proof. "[T]he constitutional minimum-contacts analysis is a fact-intensive one; and we apply it on a case-by-case basis." *Shams*, 829 N.W.2d at 858. "Rulings on questions of personal jurisdiction are reviewed for correction of errors at law." *PSFS 3 Corp. v. Seidman*, ___ N.W.2d ___, ___, 2021 WL 2603082, at *10 (Iowa 2021) (citation omitted). "The plaintiff has the burden to set forth a prima facie case that jurisdiction is appropriate, with the district court 'accept[ing] as true the allegations of the petition and the contents of uncontroverted affidavits.'" *Id.* (alteration in original) (citation omitted). "Once 'the plaintiff makes a prima facie case . . . , the burden shifts to the defendant to rebut that showing.'" *Id.* (alteration in original) (citation omitted).

Greer alleged the following in his petition: "On or before April 24, 2019, Greer responded to an advertisement listing Tailor Maid for sale. This was one of several advertisements placed on websites commonly utilized to solicit potential buyers of small businesses. These ads were targeted to all states nationwide including Iowa." Greer further alleged: "After some discussion between Greer and all of the Defendants, a Letter of Intent (LOI), attached as Exhibit A, was finalized and signed by both parties as of May 20, 2019."

The LOI contained an acknowledgment that "time is of importance" and they would "work towards closing the transaction as quickly as possible," with Greer "target[ing] a closing date of July 31," pushed back "as late as August 31." The LOI further stated, "The primary driver will be the amount of time that financing arrangements and due diligence can be completed." Although the document stated "this letter is nonbinding and constitutes an indication of intent only," the same paragraph excepted two paragraphs from the propositions. One of those paragraphs, titled "Exclusive Negotiations," stated:

> During the interim period between the execution of this letter of intent and either a) the final closing of the transaction or b) it has become evident that a transaction cannot be agreed upon, the buyer has the exclusive right to negotiate terms with the seller. Under no circumstances shall this right be extended beyond June 30, 2019 unless both parties agree in writing to renew this agreement for an additional time period.

Greer alleged, "After May 20, 2019, but before June 28, 2019, one or more Defendants made contact with one or more additional buyers and began discussions with those buyers while the original LOI was still in force." And Greer alleged:

> Beginning on or around June 13 and continuing until June 27, the Defendants began deliberately or negligently providing false and incorrect data on the firm to be purchased. This was manifested in many financial statements with different numbers being presented on the statements. There were also false statements with regard to the level of insurance that was provided for the firm. This caused unnecessary delays and was slowing and delaying the due diligence and closing process substantially.

Greer further alleged that, on June 27, 2019, he "was seeking additional data to address the discrepancies and other information and begin the final preparation of the Purchase Agreement" when the defendants' agent, "knowing that the firm was

subject to an exclusive negotiating period and the implied duty of negotiating in good faith, notified [him] via email that there was another buyer involved." Greer alleged he received another email containing "misleading and entirely false" assertions and declining to negotiate further. He raised several claims including breach of contract.

We must accept Greer's allegations as true for purposes of the personal-jurisdiction analysis. Those allegations establish that the defendants marketed to Iowa via a website catering to potential purchasers of small businesses. *See Ford Motor Co.*, 141 S. Ct. at 1026 (noting Ford "actively seeks to serve the market for automobiles and related products in" the forum states); *Ostrem*, 841 N.W.2d at 902 (concluding the defendant "purposefully directed its activities at residents of Iowa"); *Cascade Lumber Co. v. Edward Rose Bldg. Co.*, 596 N.W.2d 90, 92 (Iowa 1999) ("We have recognized a stronger interest in seeing jurisdiction extended to nonresident sellers than to nonresident purchasers."). The defendants sought out potential purchasers, including Greer. They were not simply passive purveyors of information on the internet. The defendants followed up by executing a document with an Iowa resident that afforded Greer the exclusive right to negotiate contract terms for the purchase of their business for a specified period of time. *See Ostrem*, 841 N.W.2d at 887 ("[W]e hold that this assignee is subject to personal jurisdiction in Iowa based on its own contacts with this forum through the contractual relationships it assumed by the assignment."). We recognize contracts alone do not establish minimum contacts. *See Ross v. First Sav. Bank of Arlington*, 675 N.W.2d 812, 818 (Iowa 2004) (stating participation agreements "do not alone establish sufficient minimum contacts"). But the question here is not whether the

LOI was an enforceable contract that established sufficient minimum contacts with Iowa but whether the LOI and the discussions that preceded and followed its execution were sufficient to establish that the defendants purposefully availed themselves of the forum state. *See Burger King Corp.*, 471 U.S. at 478–79.

According to the plaintiffs, those discussions established the defendants' failure to honor the exclusivity clause. Before the deadline for consummating an agreement or ending negotiations, the defendants allegedly acknowledged there was another buyer. *See Sioux Pharm, Inc.*, 859 N.W.2d at 197 (noting "allegedly unfair competition harmed the Iowa plaintiff . . . in this state under the *Calder* effects test"); *cf. Cap. Promotions*, 756 N.W.2d at 837 (declining to find specific jurisdiction where "the acts alleged to constitute the interference [with contract] were directed toward" a resident of Nevada and his Nevada manager). Greer carried his preliminary burden of proof to support exercise of specific personal jurisdiction over the defendants.

The Smiths proffered affidavits to counter the assertion of personal jurisdiction. Those affidavits did not controvert Greer's key allegations. Donnette Smith acknowledged signing the LOI and attested that she "believed the parties were on track to close a deal in July 2019." She also acknowledged sending Greer "approximately five direct messages on behalf of Tailor Maid" during the exclusivity period. Stewart ("Allen") Smith relied on the fact that he only "participated in a single phone call with Phillip Greer." But he said nothing to contradict Greer's assertion that the defendants executed a document giving the plaintiffs the exclusive right to negotiate the purchase of Tailor Maid's assets and then went behind their back to solicit another buyer. Because the affidavits failed to

undermine the allegations contained in the petition, those allegations—which ultimately may be disproved but are the litmus test for personal jurisdiction—lead us to conclude the defendants "purposefully availed" themselves of the privilege of conducting activities in Iowa. *See Shams*, 829 N.W.2d at 859 (noting defendant "was aware of the location of the bank from which she was allegedly misappropriating [the plaintiff's] funds" and "knew the bank account was in Iowa").

We are left with Greer's suggestion that he sued the Smiths in their representative and individual capacities. Nothing in his petition suggests that the Smiths were sued in their individual capacities. Accordingly, specific personal jurisdiction is established only in their capacity as owners and/or representatives of Tailor Maid.[3]

We affirm the dismissal of the Smiths in their individual capacities. We reverse the dismissal of Tailor Maid Services, LLC and the Smiths in their representative capacities and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

[3] Although Allen Smith averred that he was not an owner, the petition raises sufficient allegations that he was involved in the negotiation.